UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IRMA PERDOMO,

      Plaintiff,

v.                                   Case No. 8:21-cv-1174-VMC-CPT

TK ELEVATOR CORPORATION
a/k/a THYSSENKRUPP ELEVATOR
CORPORATION a/k/a THYSSEN
ELEVATOR COMPANY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      Before me on referral are Defendant TK Elevator Corporation's (TKE) motion for summary judgment (Doc. 31), Plaintiff Irma Perdomo's response in opposition (Doc. 39), and TKE's reply (Doc. 45). After careful review and with the benefit of oral argument, as well as the parties' supplemental briefing on the matter (Docs. 57, 58), I respectfully recommend that TKE's motion be granted.

I.

      TKE is a provider of elevator sales and services to entities and businesses in the United States. (Docs. 15 at ¶ 7; 24 at ¶ 7). Perdomo was previously employed by TKE during the period between 2014 and 2019. (Docs. 31-2 at 59:4-5; 31-4 at ¶ 11).

Perdomo began her tenure at TKE as an administrative assistant in the company's Tampa office.  (Doc. 31-2 at 59:1-24).  In July 2016, Perdomo became a Regional Service Coordinator for TKE's MAX Project, which was focused on improving the ride efficiency of TKE's elevators.  (Docs. 31-2 at 65:3-67:15, 94:10-18; 31-3 at ¶ 3; 31-4 at ¶ 3).  At a basic level, the MAX program centered around deploying a particular device—known as a MAX device or MAX unit—to alert technicians to operational problems with the elevators.  (Docs. 31-2 at 94:10-18; 31-3 at ¶ 3; 31-4 at ¶ 3).  TKE began installing MAX devices in elevators throughout the country in 2016.  (Doc. 31-4 at ¶ 7).

Perdomo's role as a Regional Service Coordinator involved "coordinat[ing] basic service operations" for forty of TKE's branches and "follow[ing] up on the service calls for [those] branches," which Perdomo considered to be "basic stuff" with "no managerial responsibilities."  (Doc. 31-2 at 67:16-25, 68:23-69:6).  Perdomo was designated to assist branches in the east region, while two other female TKE employees —Elisa Higham and Sheree Brown—were assigned to the west and central regions, respectively.  (Doc. 31-2 at 29:22-30:3, 31:5-12).

As part of her position, Perdomo communicated installation numbers and other directions to the branches in her region.  (Doc. 31-2 at 53:11-54:1).  Perdomo received

these instructions from the Max program's Lead Project Manager, Richard Gibson, who worked in California.  (Doc. 31-2 at 43:3-5, 41:15-18).

Gibson helped start the MAX Project and supervised it on a national level. (Doc. 31-2 at 45:3-14, 55:14-16).[1]  Before joining the MAX project, Gibson earned a Master of Business Administration (MBA) and then spent fifteen years serving in a variety of managerial and supervisory positions at TKE across a wide range of departments.  (Docs. 31-2 at 42:12-13; 31-5).

As the Lead Project Manager, Gibson oversaw the forecast, purchase, and distribution of over 80,000 MAX devices, which cost more than $20,000,000.  (Docs. 31-2 at 41:13-18; 31-3 at ¶ 4).  In connection with those duties, Gibson was responsible for, among other things, working with an overseas production company to place orders; tracking shipments from the overseas supplier and expediting their importation into the country when necessary to meet demand; managing the Qualified Unit List (which identified elevators in the United States that could accept a MAX device) and setting benchmarks for the product; working with TKE's engineering team to resolve technical issues and to provide progress summaries to executive leadership; managing the MAX mailing project, which involved a large-scale communication effort directed at MAX compatible customers; and interfacing with the MAX information technology systems (ITS) and TKE's suppliers to address defective devices and other quality issues

---

[1] Perdomo disputes this fact on the grounds that the phrases "start the MAX Project" and "national level" are vague, yet she also contends that she performed tasks on a "national level."  (Doc. 39 at ¶ 7).  This type of legal argument does not create a disputed issue of material fact.

when such problems arose.  (Doc. 31-3 at ¶ 4).  Gibson also assigned MAX devices to individual regions after their delivery to the United States.  *Id.*

Gibson left TKE in or around the late spring of 2017.  (Doc. 31-2 at 72:24; 31-4, ¶ 4).  In mid-June 2017, TKE evaluated the status of the personnel associated with the installation of the MAX devices and determined that Brown would replace Gibson as the Installation Project Manager.  (Doc. 31-4 at ¶ 4).

Consistent with this decision, the Vice President of TKE's U.S. Service Operations, Gary Losey, informed an HR representative in an email during this time frame that Brown would "take over [Gibson's] responsibilities until the end of August" 2017 and that the MAX Platform Manager, Robert Amthor, would be sending a "requisition for [a] future MAX" Project Manager (PM).  (Doc. 31-4 at ¶ 4; 39-9 at 1).  TKE's June 2017 summary of the "MAX Platform Status" similarly stated that "Brown [would be] replacing [ ] Gibson as Install PM."  (Doc. 31-4 at 8).  This summary also noted that "Higham and [Perdomo] [were] continuing to provide PM support in the regions" but that their positions would be eliminated in fiscal year "17/18" (i.e., 2017/2018)  (Doc. 31-4 at 8).  In early August 2017, Brown was offered the position of MAX Project Coordinator working out of a TKE office in Texas.  (Doc. 39-10).

TKE purports that, as of Gibson's resignation, most of the functions he performed as part of the MAX Project were either completed or absorbed by other employees, including Amthor and Brown.  (Doc. 31-3 at ¶ 5).  Perdomo maintains, however, that she took over all of Gibson's duties in September 2017, along with those

4

previously handled by Higham and Brown.  (Doc. 31-2 at 72:19-73:7; 39-3 at ¶¶ 5, 6).

Perdomo also testified in her deposition that she received the unofficial title of

National Project Manager from Losey around this period.  (Doc. 31-2 at 72:19–73:10).

In a declaration filed in response to the instant motion, Perdomo described her

new responsibilities on the MAX Project as ordering MAX devices for all three regions

of the United States; communicating with branches within those regions and setting

their forecasts; monitoring MAX units and arranging for mechanics to reconnect those

units that went "offline;" ordering and tracking MAX devices on a "national" level;

and working with the engineering department and ITS to resolve technical issues that

the branches were having with the units.  (Doc. 39-3 at ¶ 5).  Perdomo also attests in

her declaration that she calculated branch installation numbers, assessed the program's

progress on a weekly basis, and distributed forecasted numbers to branches.  (Doc. 39-

3 at ¶ 9).  Perdomo further avers in her declaration that these responsibilities required

her to review the major installation numbers TKE executives wanted completed and

determine the installation figures for each branch based on both the manpower

available (i.e., the mechanics in each branch) and the elevator units capable of

accepting a MAX device.  (Doc. 39-3 at ¶ 10).  Perdomo additionally claims that she

collected mass data from ITS and used it to prepare executive updates and e-mails with

predictions, forecasts, and progress reports for each branch either on a monthly basis

or upon the request of a Senior Vice President at TKE, Greg Bottom. (Doc. 39-3 at ¶ 11).

In April 2018, TKE changed Perdomo's title to "Project Manager 1" and her status to that of an "exempt" employee under the Fair Labor Standards Act (FLSA). (Docs. 31-2 at 85:17-23; 39-3 at ¶ 8). Under TKE's classification system during the relevant period, project managers were assigned one of four levels, with Level 1 being paid the least amount of money. (Doc. 31-5 at ¶¶ 3, 4). By way of example, Perdomo's salary as a Project Manager Level 1 was between $47,000 and $52,000 (Docs. 31-2 at 88:7-12; 39-11),[2] while that of Gibson—who left TKE as a Project Manager Level 4— was around $118,000 (Docs. 31-5 at ¶ 4; 46-1 at 76:14-20).[3]

According to TKE, the factors that could impact an employee's pay included the employee's education (depending upon the requirements for the job at issue), level of experience, tenure with the company, time within the position, performance, and geographic location. (Doc. 31-5 at ¶ 6). TKE also capped promotion-based pay rate increases, such that when an employee was elevated to a higher pay grade, the increase in the employee's pay generally could not exceed 20% of the employee's base pay from

---

[2] According to TKE, the minimum salary for a Project Manager Level 1 in Tampa during the pertinent time frame was approximately $51,000, the midpoint salary was approximately $68,000, and the maximum salary was approximately $82,500. (Doc. 31-5 at ¶ 5).

[3] Perdomo argues in her response that TKE did not submit evidence that it utilized the Project Manager sub-designations during Gibson's tenure, and in support she points to Gibson's written job description which did not list his salary level. *See* (Doc. 39 at 3–4) (citing Doc. 39-5). The fact that Gibson's salary level was not reflected on his job description does not contradict TKE's claim that Gibson was classified as a Project Manager Level 4 upon his last day of work. (Doc. 31-5 at ¶ 5).

his or her prior position.  *Id.* at ¶ 8.  TKE, however, would allow a larger graduated increase in limited circumstances provided it was approved by the company's compensation department.  *Id.*

After Gibson left, Perdomo testified in her deposition that she met with Losey "on several occasions [to] ask him why [her] pay wasn't reflecting that [she] was a project manager or reflecting [her] duties." (Doc. 31-2 at 101:3-5).  In her declaration, Perdomo asserts that "[o]nce [TKE] changed [her] title," she inquired of Losey why her pay did not conform to her job title and if she was "being paid less because [she was] a female," to which Losey responded "HR is working on that, it's a long process." (Doc. 39-3 at ¶ 12).  Perdomo also avers in her declaration that she asked Losey "for [her] pay to match [her] job duties as Project Manager around August/September of 2017, then two more times after that between October 2017 and August 2018." (Doc. 39-3 at ¶ 2).  According to Perdomo's declaration, Losey's response was again that "HR is working on it."  *Id.*

Perdomo additionally testified in her deposition and attests again in her declaration that in late 2017, Bottom moved her workstation from an enclosed office to a cubicle and gave her office to a male employee who was a "new hire." (Docs. 31-2 at 227:3–228:15; 39-3 at ¶ 3).  Another TKE employee testified, however, that this change in Perdomo's workstation was part of a "restructur[ing] of some kind," which involved the relocation of other employees' desks as well. (Doc. 46-1 at 71:4-22).

In July 2018, Regional Project Manager Deborah Scott—who Perdomo maintains was only minimally involved in the MAX Project (Doc. 39-3 at ¶ 13)—

complained about the accuracy of Perdomo's reports. (Doc. 31-4 at ¶ 5, Ex. B). TKE's National Director of Service Operations, Terry Story, investigated the matter and determined that Scott's concerns were well founded. *Id.* As Story was not Perdomo's supervisor at the time, however, he notified Bottom and Losey about the issue. *Id.*

In response, Perdomo wrote to HR employee Amanda Davis that Story was "always attacking [her] without knowing or researching the facts." (Doc. 39-34 at 1). Losey, as Perdomo's then-supervisor, subsequently issued Perdomo a warning notice and performance improvement plan in early August 2018 for "substandard work" based in part on the concern identified by Scott. (Docs. 31-2 at 100:11-19, 107:5-15; 31-7). Perdomo thereafter emailed HR employee Wendy Prell that she found it "bizarre" to be written up for the correctness of her submissions when the data she used was generated by TKE's own system. (Doc. 39-15). Despite this write-up by Losey, Perdomo later received both an annual raise and a $3,000 bonus. (Docs. 31-2 at 98:17-99:2; 39-29).

Around the same time frame as Scott's complaint about Perdomo's reporting, Perdomo attended a meeting at which she was told that the MAX Project would continue into 2024. (Doc. 39-3 at ¶ 7). According to Perdomo's declaration, "[n]ew controllers were being added to the pool of qualified elevators [which could] accept [the] MAX" devices, and the next generation of the MAX program—known as "LC MX/MAX 2.0"—"was underway[,] which had 4G network integrated and was set to be installed on elevators in the year 2022." (Doc. 39-3 at ¶ 7). Perdomo further attests in her declaration that there was a "minimum of [two] years left" on the MAX Project,

8

"depending on" the communication of MAX devices and "how many controllers/elevators were added to the qualification pool." (Doc. 39-3 at ¶ 14). When deposed on the matter, Perdomo acknowledged that there was an "end date" to the MAX program when all of the units would be installed. (Doc. 31-2 at 117:8-118:20).

Perdomo alleges that in or around the fall 2018, her name was not submitted for attendance at a TKE management conference, which was to be held in Atlanta in December 2018. According to Perdomo, she "had to go around [ ] Bottom and [ ] Story and [had to] ask[ ] the conference organizer to let [her] go." (Doc. 39-3 at ¶ 4). It is uncontested that, in the end, Losey authorized Perdomo to attend the conference. (Doc. 31-2 at 137:8-23).

In October 2018, Losey resigned and Story became Perdomo's supervisor. (Doc. 31-4 at ¶ 6; 31-2 at 114:16-21, 133:14-20).[4] Not long after, in November 2018, TKE announced a "closing the gap" initiative, which required staff reductions and budget cuts across the country. (Doc. 31-4 at ¶¶ 9-10). In connection with this initiative, TKE's CEO, John Murmane, e-mailed colleagues in late 2018 that "[w]e as leaders are being challenged with reducing our [h]eadcount by [fifty full-time employees] by [the] end of January" 2019. (Doc. 31-4 at 22). The guidelines for TKE's budget cuts encompassed the termination of both "under-perform[ing]" and non-performing employees. (Doc. 39-18 at 1; 39-20 at 1).

---

[4] Perdomo "disputes" this fact "to the extent that Story's supervision is "mischaracterized as material," yet concedes that Story was indeed her supervisor. (Doc. 39 at 7).

According to TKE, Story and Bottom determined that Perdomo would be part of the "closing the gap" initiative because "her role was no longer necessary for the MAX Project."  (Doc. 31-4 at ¶ 9).  In accordance with this decision, Story advised a colleague in mid-November 2018 that TKE was "eliminating" Perdomo's position because it was unnecessary at that point to "project manage" the MAX installations.  (Doc. 31-4 at ¶ 9, p. 19).  Story added in his email that Perdomo had "even told [him] that she thought her job was going away at the end of FY 18."  (Doc. 31-4 at 19).  Story further determined that Christopher Anderson, a male who was also classified as a Project Manager Level 1, would be let go as well.  (Doc. 31-4 at ¶ 11).  As described by Perdomo in her response, the "TKE Brain Trust"—which she defines as certain HR representatives and executives, including Bottom, Prell, and Nicole Antonneau (another HR professional)—ultimately finalized her separation from TKE.  (Doc. 39 at 2, 8).

In January 2019, TKE eliminated roughly fifty positions—including Perdomo's—as part of its "closing the gap" initiative.  (Doc. 31-4 at ¶ 11, p. 28).[5] Perdomo's termination letter, dated January 23, 2019, states that she was discharged "[d]ue to staff reductions within [her] department."  (Doc. 31-8).  According to TKE, Brown "oversees the forecast, purchase, and distribution of second-generation MAX

---

[5] Perdomo disputes this fact on the basis that it involves "legal conclusions and mischaracterizations regarding a possible WARN Act event," and points to an organizational chart she claims reflects open positions in her department.  (Doc. 39 at ¶ 27).  Such evidence and argument does not create a disputed issue of material fact as to whether the lay-offs described by TKE occurred.

devices" at this point, in addition to handling her other responsibilities.  (Doc. 31-3 at ¶ 6).

Based upon the above events, Perdomo initiated this action in May 2021 by filing a complaint against TKE pursuant to Title VII of the Civil Rights Act of 1964, § 701, *et seq.*, 42 U.S.C. § 2000e, *et seq.* (Title VII), and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (EPA).  (Doc. 1).  In a subsequently filed amended complaint, Perdomo asserts six counts against TKE, one of which—Count II—was dismissed by the Court in October 2021.  (Doc. 23).  Perdomo's remaining counts allege that TKE discriminated against her by paying her less than Gibson and other similarly situated males, in violation of Title VII (Count I); retaliated against her after she complained about gender discrimination in compensation by terminating her employment, among other adverse acts, in violation of Title VII (Count III); wrongfully terminated her because of her gender and in retaliation for her discrimination complaints, in violation of Title VII (Count IV); retaliated against her and terminated her in violation of the EPA after she complained about gender discrimination in compensation (Count V); and discriminated against her in violation of the EPA by paying her less than Gibson and other similarly situated male employees (Count VI).  (Doc. 15).

By way of the instant motion, TKE now seeks summary judgment in its favor on the entirety of Perdomo's complaint.  (Doc. 31).  As alluded to above, I heard oral argument on TKE's motion and also received additional submissions from the parties. The matter is thus ripe for the Court's consideration.

11

II.

Summary judgment is warranted when the movant can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

If a moving party makes the requisite showing, the non-movant must then designate specific facts (by her own affidavits, depositions, answers to interrogatories, and/or admissions on file) evidencing that there is a contested question of material fact for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). To do so, the non-movant must rely on more than conclusory statements and unsupported allegations. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.") (citations omitted). If a party fails to properly buttress "an assertion of fact or fails to properly address another party's assertion of fact," a court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to" the sought-after relief. Fed. R. Civ. P. 56(e).

12

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the non-movant. *Welding Servs.*, 509 F.3d at 1356. That is, it must credit the evidence tendered by the non-movant and draw all justifiable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). In doing so, a court may not "weigh conflicting evidence or make credibility determinations" regarding a party or its presentation of the facts. *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) (citations omitted).

### III.

#### A.  Threshold Deficiencies with Perdomo's Response

I am obliged at the outset to highlight several threshold infirmities with Perdomo's response to TKE's summary judgment motion (Doc. 39), which taken individually or together could be construed as fatal to her defense of at least some of her claims. The first of these deficiencies is the wholly perfunctory fashion with which she addresses TKE's arguments directed at her Title VII wrongful termination and her EPA retaliation causes of actions (i.e., Counts IV and V). *Id.* at 18–22. While Perdomo separately designates her arguments in support of her Title VII disparate pay and retaliation claims (i.e., Counts I and III) under the captions "Title VII—Pay Discrimination" and "Title VII—Retaliation," respectively, *id.* at 11, 18, she does not likewise dedicate a section in her response to her wrongful termination claim. Instead, embedded within her Title VII retaliation cause of action where she identifies "wrongful termination" as one of the adverse employment actions she claims she experienced, Perdomo drops a footnote asking that the Court "consider [the] factual

and legal arguments presented in support of [her] Title VII claim for gender-based pay discrimination where her *termination was pretext*."  *Id.* at 18 n.7 (emphasis in original). Notably missing from this footnote is any clear indication that it even pertains to her wrongful termination claim; instead, it appears Perdomo expects the Court to infer as much.  Also conspicuously absent from the footnote are any case citations or legal analysis addressing the application of the law governing Title VII wrongful termination claims to Perdomo's case.  Further compounding this confusion is the fact that Perdomo does not direct the Court to where it can find her "factual and legal arguments" relating to "pretext" and instead leaves it to the Court to ferret out that information on its own.[6]

Perdomo's defense of her EPA retaliation claim suffers from a similar defect. Rather than address TKE's challenges to that cause of action in the body of her response, Perdomo again drops a footnote requesting the Court to "consider [the] factual and legal arguments presented in support of [her] Title VII claims for her Equal Pay Act claims[,] as there is considerable overlap between the two statutory schemes." (Doc. 39 at 20 n.8).  Like her wrongful termination claim, Perdomo does not provide any case law or legal discussion substantiating the merits of her EPA retaliation claim. This "incorporation by reference" approach is particularly problematic with respect to Perdomo's two EPA claims because the two causes of action have different elements.

---

[6] While not entirely clear, it appears that these arguments are located on pages 15–17 of Perdomo's response.  (Doc. 39).

*Compare Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994) (explaining that a plaintiff seeking to establish a sex discrimination claim under the EPA must initially show "that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility") (internal quotations omitted), *with Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018) ("To establish a *prima facie* case of retaliation [under the EPA], a plaintiff may show that (1) she engaged in activity protected under the act; (2) she subsequently suffered a materially adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.") (citing *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000)).

The Eleventh Circuit has found on numerous occasions that the type of cursory treatment Perdomo affords the defense of her wrongful termination and retaliation claims constitutes a waiver. *See., e.g., Battle v. Comm'r, Soc. Soc. Admin.*, 787 F. App'x 686, 687 (11th Cir. 2019) (per curiam) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.") (quoting *N.L.R.B. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998)); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting that a court need not consider "perfunctory and underdeveloped" arguments and that such arguments are waived); *Edmondson v. Bd. of Trustees of Univ. of Ala.*, 258 F. App'x 250, 253 (11th Cir. 2007) (per

15

curiam) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Outlaw v. Barnhart*, 197 F. App'x 825, 828 n.3 (11th Cir. 2006) (per curiam) (stating that a plaintiff waived an argument "because he did not elaborate on [the] claim or provide citation to authority about [it]") (citing *Cheffer v. Reno*, 55 F.3d 1517, 1519 n.1 (11th Cir. 1995)).

Another problem with Perdomo's response is that it fails to identify with sufficient clarity the legal basis on which she is defending each of the counts in her operative complaint. This defect is particularly consequential in the context of a Title VII intentional discrimination case like this one because a plaintiff can defeat a defendant's summary judgment motion in a number of ways—namely, by (1) presenting direct evidence of discriminatory intent; (2) satisfying the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) marshaling a "convincing mosaic" of circumstantial evidence that creates an inference of intentional discrimination. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (en banc) (*Lewis I*).

Here, Perdomo references both the *McDonnell Douglas* and the convincing mosaic approaches in her response but does not specify which theory she seeks to invoke. (Doc. 39 at 10–12). When questioned about this ambiguity at oral argument, Perdomo represented for the first time that she was abandoning the *McDonnell Douglas*

16

framework and was instead relying solely on the convincing mosaic standard for both her Title VII and her EPA claims.  When further inquiry suggested that Perdomo could not properly utilize this standard across all of her counts, I directed the parties to submit supplemental briefing on the issue.  (Doc. 55).

In her subsequent filing, Perdomo acknowledged that she could only employ the convincing mosaic theory for her Title VII causes of action but not for her EPA claims.  (Doc. 57 at 1–4) (conceding the "[i]napplicability of the convincing mosaic standard to [her] Equal Pay claims").  Perdomo's back-and-forth on these theories has created additional confusion and has caused the needless expenditure of judicial resources in an effort to decipher the factual and legal contours of her Title VII and EPA claims.[7]

Lastly, Perdomo's response also falls short insofar as it fails to properly address TKE's statement of material facts.  In its *Order on Motions for Summary Judgment* (Doc.

---

[7] Perdomo creates further confusion in her response by making fleeting references to the evidence supporting a finding that her sex was a "motivating factor" for the pay disparity between herself and Gibson.  (Doc. 39 at 11) (citing 42 U.S.C. § 2000e-2(m)).  This type of an argument is akin to a "mixed-motive" discrimination claim analyzed under the framework described in *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016), which requires a showing that an "illegal bias . . . 'was a motivating factor for' an adverse employment action, even though other factors also motivated the action," *id.* at 1235 (quoting 42 U.S.C. § 2000e-2(m)).  In contrast, a "single-motive" discrimination claim is analyzed under either the *McDonnell Douglas* or circumstantial mosaic frameworks.  *See Williams v. Housing Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 454 (11th Cir. 2019) (per curiam) (internal citation and quotation omitted).  Because Perdomo has insisted that the Court apply a convincing mosaic standard (as is done in a "single-motive" case) and because she has argued that TKE's reasons are pretext (which is a doctrine applicable to "single-motive" cases), *Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 130–31 (11th Cir. 2019) (per curiam), I deem her "passing reference to a mixed-motive theory" insufficient to raise the issue, *id.* at 130.

14), the Court instructed Perdomo to "mirror the statement of material facts [tendered by TKE] by admitting and/or denying each of [TKE's] assertions in matching numbered paragraphs" and by including with "[e]ach denial . . . a pinpoint citation to the record where the fact is disputed." *Id.* at 2. The Court further instructed Perdomo that where she contended additional facts were material, she should number such facts and place them at the end of the response, along with a pinpoint citation. *Id.* at 3.

Instead of following these directives, Perdomo frequently responds to TKE's factual statements by including argument and additional facts she apparently contends are material, as opposed to setting them out in a separate section. *See, e.g.,* (Doc. 39 at ¶¶ 2, 7, 14, 21, 22, 24, 25, 26, 27, 28, 31). Perdomo also repeatedly "disputes" TKE's "characterization" of the facts or summarily describes them as "vague." *See, e.g.,* (Doc. 39 at ¶¶ 2, 5, 7, 8, 9, 10, 12, 17, 21, 22, 27, 28, 31, 33). As a result, the Court is left to sift through both the record and Perdomo's brief to determine the instances where she is raising a legal argument or attempting to identify a genuine issue of material fact. Perdomo's failure to abide by the Court's instructions renders her submissions even more wanting.

Except where I have provided a recommendation for the Court's consideration, I defer to the Court as to what, if any, remedy is appropriate given these threshold deficiencies. I do note, however, that the Court has viewed such transgressions dimly in the past. *Perez v. Cigna Health & Life Ins. Co.*, 2020 WL 1308196, at *5 (M.D. Fla. Mar. 19, 2020) (Covington, J.) (declining to credit legal arguments or material facts

18

which, in contravention of the Court's summary judgment Order, were not supported by pinpoint citations or pertinent record evidence).

## B.   Sham Affidavit Rule

I am also obliged to address at the outset one other threshold issue that cuts across several of Perdomo's claims.  In its reply, TKE requests that the Court invoke the "sham affidavit rule" to strike certain aspects of Perdomo's declaration filed in response to TKE's summary judgment motion.   (Doc. 45 at 2).  I asked for further briefing on this issue following oral argument to ensure that Perdomo had an adequate opportunity to be heard on the matter.  (Doc. 55).

The sham affidavit rule authorizes a court to "disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony." *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (per curiam).  The rule applies when a party has "given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [but then seeks to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

To invoke the rule, a court must find an "inherent inconsistency" between the declaration and the previous sworn statements.  *Kilgore v. Trussville Dev., LLC*, 646 F. App'x 765, 771 (11th Cir. 2016) (per curiam).  The Eleventh Circuit has long cautioned that this rule is to be used "sparingly because of the harsh effect [it] may have on a party's case." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987); *see also*

*Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 n.6 (11th Cir. 2012) (same). Accordingly, a  party bears a "heavy burden" to exclude an affidavit as a sham. *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1356 (S.D. Ga. 2015); *see also In re Stand 'N Seal, Prods. Liab. Litig.,* 636 F. Supp. 2d 1333, 1335 (N.D. Ga. 2009).

In this case, TKE argues that the Court should apply the sham affidavit rule and disregard the portion of Perdomo's declaration describing her purported conversation with Losey about a possible gender-based reason for the pay disparity between her and Gibson, as well as the portion of her declaration relating to the tasks she allegedly performed after Gibson resigned.  (Docs. 45, 58).  I will each address each of these challenges in turn.

With respect to the former, Perdomo testified on a number of occasions during her deposition that she met with Losey to ask TKE to raise her pay to match Gibson's because she had allegedly taken on his responsibilities as a project manager.  This testimony occurred during the following exchanges between Perdomo and defense counsel:

> Q.    And why did you receive th[e August 2018] write up [from Losey]?
> A.    I believe it was in retaliation for asking for a pay raise.
> Q.    Why do you believe it was a retaliation for asking for a pay raise?
> A.    *Because I would meet with [Losey] on several occasions and ask him why my pay wasn't reflecting that I was a project manager or reflecting my duties*?
> Q.    And so run me through each instance where you met with [Losey] to discuss or request for a pay raise.
> A.    The first time was when he told me I was taking over Richard Gibson's duties which was sometime in August of 2017.  And then there was two more instances where he came into the office *and I asked him if he could again update my job title which was not reflecting all of the duties that I*

20

*was being assigned after Richard Gibson left.*

Q.      You're referring to the job description you wrote?

A.      Correct.

* * *

Q.      And you said you received that write up August of 2018 you said in retaliation; correct?

A.      Correct.

Q.      And why do you believe it was retaliation?

A.      *Because I kept asking him to match my job duties that he gave me that Richard Gibson had.  I raised that concern several times.*

* * *

Q.      So you provided information to Wendy Prell that showed what?

A.      That I was being written up for retaliating and *asking for my salary to match my duties that I have acquired from Richard Gibson.*

* * *

Q.      So besides what we've already talked about do you have any other evidence that you received this write up in retaliation for requesting additional pay to Gary Losey?

A.      No, I believe I submitted everything I have.

* * *

Q.      Do you think you were let go in retaliation for anything?

A.      Yes.

Q.      What?

A.      *Because I was asking for my pay to be representing my duties and my job title.*

Q.      *And those were the conversations you had with Gary Losey?*

A.      *Correct.*

Q.      *Any other conversations we haven't talked about?*

A.      *Not that I remember.*

* * *

Q.     You also say that there were gender inequities at the company and that you complained about them.  To who[m]?

A.     I don't remember.

\* \* \*

Q.     Can you tell me every time you complained about something to TKE that you think contributed to your termination?

A.     Well, the two or three times I talked to Wendy Prell, the time that I talked to Amanda Davis, and the three times that I spoke with Gary Losey about my pay.

Q.     And why do you believe you would have been retaliated against for speaking to Wendy Prell?

A.     Because they didn't want to give me the title that I asked for for eight months—or over six months and they didn't want to change my pay.  *They wanted me to perform duties and just not pay me as a project manager. They wanted to pay me as an administrator.*

\* \* \*

Q.     Were there any other instances where you complained about something at TKE that you think resulted in your termination?

A.     No.

Q.     Do you have any evidence to support your belief that you were terminated because you complained to either Wendy, Gary, Amanda, or anyone else?

A.     Not that I can think of right now.

Q.     *Aside from what we've already spoken about today are there any other acts or incidents that you believe are part of your discrimination claim?*

A.     *No.*

Q.     Aside from what we've already talked about today are there any other incidents that you believe are part of your retaliation claim?

A.     No.

Q.     *Besides what we've already talked about are there any other acts that you believe are part of your unequal pay claim?*

A.     *No.*

(Doc. 31-2 at 101:23-101:17, 103:18-24, 104:25-105:4, 105:21-25, 127:5-16, 138:5-8, 143:15-144:2, 145:15-146:9) (emphasis added).

As the foregoing excerpts reveal, Perdomo recounted her complaints to TKE about her pay several times in her deposition and was asked follow-up questions regarding any additional relevant information she had to offer. Perdomo did not testify, however, that she questioned Losey during those exchanges about whether she was being discriminated against on account of her sex.

The first time she made a reference to sex discrimination as a potential basis for the salary differential between her and Gibson was in her declaration. There, she attested:

> Losey, Bottom and HR decided to pay me less because I am a female. My pay never matched my male boss' salary. I asked Gary Losey for my pay to match my job duties as Project Manager around August/September of 2017, then two more times after that between October 2017 and August 2018. His response was "HR is working on it."
>
> * * *
>
> Once they changed my title they didn't make any comments about the pay, once I received my check reflecting the changes I noticed no change to pay and asked Gary Losey "why my pay was not reflecting my job title" *and if "I am being paid less because I am a female"* and his was [sic] response was "HR is working on that, it's a long process[."]

(Doc. 39-3 at ¶¶ 2, 12) (emphasis added).

Perdomo explains in her supplemental submission that the attestation in her declaration that she queried Losey about a gender discriminatory basis for her lesser

compensation merely expanded upon, rather than contradicted, her deposition testimony.  (Doc. 57).  She also argues that she should not be bound by answers in her deposition to legal contentions.  *Id.* (citing *Rifkind v. Superior Ct.*, 22 Cal. App. 4th 1255, 1258 (Cal. App. 2d Dist. 1994)).[8]

The application of the sham affidavit rule in this case presents a close question. The problem I see from TKE's perspective is that it does not identify any testimony from Perdomo's deposition where she clearly advised that the complaints she made to Losey during the above conversations were solely about matching her pay with her duties and nothing else.  TKE also does not point to any testimony where Perdomo affirmatively stated she did not raise the matter of her status as a female as a reason for her pay discrepancy with Gibson.  *See Sears v. PHP of Ala., Inc.*, 2006 WL 932044, at *11 (M.D. Ala. Apr. 10, 2006) ("[A]n affidavit which clarifies, augments, elaborates[,] or explains prior deposition testimony is not 'inherently inconsistent' within the meaning of the sham affidavit rule.").

The decision in *Perez*—which was issued by the presiding District Judge in this action—is instructive in this regard.  In *Perez*, the plaintiff stated in a declaration that he told his supervisor his wife had filed a discrimination suit and he was having his

_____

[8] The *Rifkind* court defined legal contention questions as ones "requir[ing a] party . . . to make a law-to-fact application that is beyond the competence of most lay persons."  22 Cal. 4th at 1262 (internal quotation marks and citation omitted).  The court opined that the "basic vice [of such queries] when used at a deposition is that they are unfair [because t]hey call upon the deponent to sort out the factual material in the case according to specific legal contentions, and to do this by memory and on the spot."  *Id.*  I do not render any opinion as to whether this is an apt descriptor for the challenged inquiries here.

24

deposition taken in support of his wife's claim. *Perez*, 2020 WL 1308196, at *6. Yet the plaintiff did not "list" his supervisor when he was asked during his deposition who he told about his wife's discrimination claim and his upcoming deposition in that proceeding. *Id*. In addition, the plaintiff testified at his deposition that he "only" told his supervisor he believed a disruption to his internet service was "intentional," but claimed in his declaration that he informed his supervisor the disruption was due to the plaintiff's part in serving the defendant with a lawsuit. *Id*. The Court ultimately determined that the plaintiff's declaration was inherently inconsistent with his deposition on those two points and ruled that it would not consider the part of the plaintiff's declaration which was in conflict with his deposition testimony pursuant to the sham affidavit rule. *Id* at *6–7.[9]

Applying the teachings of *Perez* here, I find it noteworthy that TKE has not designated any instance in Perdomo's deposition where she was directly asked to list or describe the topics she discussed with Losey and, in answering that unambiguous question, failed to mention the gender-based inquiry she allegedly posed to him. Nor has TKE come forward with any testimony by Perdomo where—contrary to her declaration—she advised that she "only" spoke to Losey about pay issues unrelated to her sex.

---

[9] This Court found additional support for its conclusion in the fact that the plaintiff did not address the sham affidavit issue at all in his response, which suggested to the Court that the plaintiff could not "harmonize" his declaration and his prior testimony. *Perez*, 2020 WL 1308196, at *7.

As for the so-called contention questions, I note that TKE has not cited any cases where courts have found that parties have met their heavy burden for invoking the sham affidavit rule based on the use of such general catch-all queries during or at the end of a deposition.  The absence of such authority gives me further pause as to the propriety of invoking the sham affidavit rule here, particularly given the Eleventh Circuit's admonition that the rule is to be applied "sparingly" due to "the harsh effect [it] may have on a party's case."  *Rollins*, 833 F.2d at 1530.

I am even less persuaded by TKE's efforts to deploy the sham affidavit rule to strike the attestations in Perdomo's declaration regarding the tasks she undertook after Gibson's departure. (Doc. 58).  By way of example, TKE notes that Perdomo testified at her deposition that she would forward software updates from IT to the branches (Doc. 31-2 at 81:11-25) but claimed in her declaration that she "worked with" the IT and engineering departments to resolve technical issues (Doc. 39-3 at ¶ 5).  (Doc. 58 at 8). TKE also generally argues Perdomo identified additional job duties in her declaration which she did not list in her deposition.  *Id.*  While the portions of Perdomo's declaration and deposition may, in fact, be different as TKE maintains, it does not appear that they are inherently consistent with each other.  Rather, it seems that Perdomo testified generally about her responsibilities and, in doing so, identified much of what she later described in her declaration. *Compare* (Doc. 31-2 at 74–83), *with* (Doc. 39-3 at ¶¶ 5, 9, 10).

26

In the end, the Court need not resolve TKE's sham affidavit argument because even assuming the rule applies, TKE still prevails on its summary judgment motion.  I turn to the merits of that motion now.

IV.

*A.   Count I: Title VII Pay Discrimination Claim*

I commence my analysis with TKE's challenge to Perdomo's Title VII claim for unlawful pay discrimination in Count I.  Perdomo avers in that cause of action that TKE "treat[ed] her differently from, and less preferably than, similarly situated males, including her male predecessor [i.e., Gibson], by subjecting her to discriminatory pay." (Doc. 15 at 12).[10]   Title VII states, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . .").  42 U.S.C. § 2000e-2(a)(1).  Here, the gist of Perdomo's claim is that she took over Gibson's duties upon his resignation but was paid a lesser salary by TKE on account of her gender.

When evaluating a Title VII disparate pay claim based on circumstantial evidence, courts ordinarily employ the framework set forth by the Supreme Court in *McDonnell Douglas*.  *Blackman v. Fla. Dep't of Bus. & Prof. Regul.*, 599 F. App'x 907, 913 (11th Cir. 2015) (per curiam).  Under the *McDonnell Douglas* framework, a plaintiff has

---

[10] Although Perdomo references "other similarly situated males," she does not identify any other such males in her response and confirmed at oral argument that Gibson was the only potential comparator.

27

the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence.  *See Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).  "To establish a *prima facie* case of discrimination based on a disparity in pay, a plaintiff must show that [she] occupies a position similar to that of a higher paid employee outside of [her] protected class."  *Johnson v. Coffee Cnty. Comm'n*, 714 F. App'x 942, 948 (11th Cir. 2017) (per curiam) (citing *Crawford v. Carroll*, 529 F.3d 961, 974–75 (11th Cir. 2008)).

If a plaintiff makes such a showing, the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged action.  *Blackman*, 599 F. App'x at 913 (citing *Arrington v. Cobb Cnty.*, 139 F.3d 865, 873 (11th Cir. 1998)).  If the defendant offers such a legitimate reason, the plaintiff must then demonstrate that the reason was a mere pretext for an illegal motive.  *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

The *McDonnell Douglas* framework, however, "is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case."  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).  Instead, a plaintiff may—as Perdomo has elected to do here—endeavor to defeat a summary judgment motion by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Smith*, 644 F.3d at 1328.  Indeed, the Eleventh Circuit has explained that the convincing mosaic theory "can be of particular significance when the plaintiff cannot identify a similarly situated

28

comparator" for purposes of *McDonnell Douglas*. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (per curiam) (collecting cases). As TKE pointed out in its supplemental legal memorandum (Doc. 58), at least one district court has applied the convincing mosaic standard to Title VII disparate pay causes of action like that alleged by Perdomo in Count I. *See Vinson v. Macon-Bibb Cnty.*, 2020 WL 2331242, at *12 (M.D. Ga. May 11, 2020), *aff'd sub nom.*, 844 F. App'x 211 (11th Cir. 2021).

Regardless of the nature of the claim under Title VII, a plaintiff seeking to rely on the convincing mosaic approach must produce testimony and exhibits "that demonstrate[ ], among other things, (1) suspicious timing, ambiguous statements and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*) (internal quotations and alterations omitted). In pursuing these evidentiary threads, a plaintiff must "present the tiles and create the mosaic [rather than] expecting the court to piece it together for [her]." *Murphree v. Colvin*, 2015 WL 631185, at *8 (N.D. Ala. Feb. 13, 2015).

I begin with whether Perdomo can show that TKE's justification for paying Gibson more money is pretextual, which—as noted above—is one of the ways she can show discriminatory intent under the convincing mosaic standard. *Lewis II*, 934 F.3d at 1185. Perdomo can demonstrate such pretext by:

(i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies.

*Lewis II*, 934 F.3d at 1186; *see also Crawford v. City of Fairburn, Ga.,* 482 F.3d 1305, 1309 (11th Cir. 2007) (explaining that proof of discriminatory animus does not show pretext unless it rebuts the legitimate nondiscriminatory reasons proffered by the employer). Perdomo must establish, however, that the employer's reasons were not only false but that the real purpose was discrimination. *Tsavaris v. Savannah Law Sch., LLC*, 847 F. App'x 634, 642 (11th Cir. 2021) (per curiam); *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

In its summary judgment motion, TKE sets forth sufficient evidence that, at a minimum, Gibson's compensation exceeded Perdomo's because of his greater experience, higher education, and longer period of service, as well as because Gibson (situated in California) and Perdomo (located in Florida) worked in different regions of the country and thus were subject to geographically disparate pay policies.  (Doc. 31 at 17–18).  By way of example, it is uncontested that Gibson earned an MBA and worked at TKE for fifteen years in various managerial and supervisory positions prior to his resignation.  (Docs. 31-2 at 42:12-13; 31-5).  Perdomo, on the other hand, was only employed at TKE for approximately five years, and even then partially as an administrative assistant, and only obtained a bachelor's degree shortly before she was terminated.  (Doc. 31-2 at 59:4-24, 160:14-25).  Based on their experience and other

qualifications, TKE classified Gibson as a Project Manager Level 4 and Perdomo as a Project Manager Level 1 at the time of their respective departures.  (Doc. 31-5 at ¶¶ 4, 9).  Moreover, TKE points out that Gibson helped start the MAX Project and was instrumental in moving it from the installation phase to the activation phase.  (Docs. 31-2 at 45:3-14, 55:14-16; 31-3 at ¶ 4).  These reasons constitute a legitimate and non-discriminatory basis buttressing TKE's decision to pay Gibson a higher salary than Perdomo.  *Blackman,* 599 F. App'x at 913 (concluding that an employer offered a legitimate, nondiscriminatory explanation for a salary differential between employees where one held a bachelor's degree and a master's degree and the other held only a bachelor's degree); *Mahone v. BBG Specialty Foods, Inc.*, 2018 WL 1526336, at *8 (M.D. Ala. Mar. 28, 2018) (finding an employer was justified in paying a higher rate of pay to an employee due to her "prior experience and length of service").

As a result, Perdomo bears the burden of showing not only that these explanations were false, but that discrimination based on her sex was the real rationale for the pay disparity between her and Gibson.  *Lewis II,* 934 F.3d at 1186.  To meet her burden, Perdomo must do more than "simply quarrel" with the wisdom of the justifications proffered by TKE "that might motivate [any] reasonable employer."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  Instead, she "must meet th[ose] reason[s] head on and rebut [them]."  *Id.*  And, because TKE "proffers more than one legitimate, nondiscriminatory reason, [Perdomo] must rebut each of the reasons to survive [TKE's] motion for summary judgment."  *Crawford*, 482 F.3d at 1308; *see also Tompkins v. Cuts By Us, Inc.*, 2019 WL 3387775, at *11 (N.D. Ala.

July 26, 2019) (explaining that the plaintiff did not show discriminatory intent based on a convincing mosaic where she rebutted only one of the employer's proffered reasons for denying her a promotion).

Perdomo does not meet her burden here.  In short, she effectively abandons any claim that she possessed the same experience, education, and tenure with TKE as Gibson, and she also fails to meaningfully address the geographical pay disparity issue. Her only contention appears to be that while it is true "Gibson worked at various positions during his tenure with TKE, his last role was Lead Project Manager – a role that was assigned to Perdomo."  (Doc. 39 at 4) (citing Doc. 39-3 at ¶ 5).  This circular argument does not "meet [TKE's] reason[s] head on and rebut [them]." *Chapman*, 229 F.3d at 1030.  To the contrary, Perdomo essentially ignores them and tries to shift the focus to whether she was merely capable of holding Gibson's position irrespective of other factors, such as her experience, education, time with the company, and the location of her work station, all of which might affect her compensation.

And, even resolving in Perdomo's favor any dispute about whether she took on all of Gibson's tasks at the time of his resignation, Perdomo's assertion that she performed the same work as Gibson following his departure from the company is flawed because it does not squarely rebut TKE's additional justification for Gibson's greater compensation—namely, that he helped launch the MAX Project and then oversaw its subsequent development and growth.  (Doc. 31 at 10–11).

Because Perdomo does not confront and rebut all of the justifications offered by TKE to explain the pay disparity between her and Gibson, any attempt by her to show

32

pretext fails.  *Crawford*, 482 F.3d at 1308; *Devito v. W. Publ'g Corp.*, 2021 WL 5826120, at *10 n.9 (M.D. Fla. Dec. 8, 2021) (declining to address whether the plaintiff may have raised a genuine issue of material fact regarding the falsity of one of the defendant's legitimate, nondiscriminatory reasons where the defendant provided two other legitimate, nondiscriminatory reasons for the plaintiff's termination for which the plaintiff did not establish pretext).

Aside from pretext, it seems that Perdomo also seeks to demonstrate a convincing mosaic by marshalling "bits and pieces [in the record] from which an inference of discriminatory intent might be drawn."  *Lewis II*, 934 F.3d at 1185.  As discussed above, this is another recognized way to satisfy the convincing mosaic standard.  *Id.*

The "bits and pieces" Perdomo appears to assemble include that (1) Bottom asked for the title of Perdomo's position to be Project Manager Level 1, while a member of the Human Resources staff recommended a title of "Analyst II;" (2) TKE "paid [Perdomo] less than the minimum salary" for her position; (3) TKE disregarded its own compensation guidelines in setting her salary; (4) she changed her email signature block to "National Project Manager – Max" without objection from Losey, Bottom, or Story; (5) the "TKE Brain Trust" insisted she "create and document a new job description to avoid mirroring Gibson's duties;" (6) TKE's extolling of Gibson's status "as a revered and exemplary employee," while denigrating Perdomo  as a "low-level lackey engaging in 'basic stuff;'" and (7) Perdomo's self-described "exemplary"

job performance and annual pay increases.  (Doc. 39 at 11–14).  None of these assertions survives scrutiny.

Starting with Perdomo's first point about "misclassification," it is not all evident from her response whether she is attempting to show that TKE should have designated her as a Project Manager Level 4 like Gibson, whether she is arguing that she should have been given another title—such as Analyst II—or some other title that she fails to specify, or both.  Thus, it is entirely unclear how Perdomo's "misclassification" contention is even relevant to her pay discrimination claim, much less how it demonstrates discriminatory intent.

As for Perdomo's second point about TKE's alleged failure to pay her the minimum salary for her position, this argument seems to be predicated upon TKE's change in Perdomo's FLSA status from a "non-exempt" to an "exempt" employee in April 2018, which—according to Perdomo—caused a reduction in her salary from $50,000 to $48,509.  (Doc. 39-3 at ¶ 16).  TKE, on the other hand, submitted evidence showing that the minimum salary for a Project Manager Level 1 in Tampa in 2018 was "about $51,000."  (Doc. 31-5 at ¶ 4).  Regardless of this discrepancy, it is undisputed that Perdomo's salary modification came at her own request after she became frustrated that she needed to seek approval to work overtime.  (Doc. 39-33).  As a result, Perdomo does not show that TKE made this change—or the resulting pay reduction—for some discriminatory reason.

With respect to Perdomo's third point that TKE purportedly ignored its own compensation guidelines presumably so that it could disparately compensate her,

Perdomo does not identify which particular policy TKE violated in setting her salary. (Doc. 39 at 13–14).  Instead, she cites only to a portion of TKE's salary guidelines that seems to specify exceptions to its salary policy.  (Doc. 39 at 12) (citing Doc. 39-14 at 7).  Notably, she does not articulate in her response, nor did she describe at oral argument, how TKE contravened this provision.  Perdomo has therefore failed to demonstrate that there is a genuine issue of fact as to TKE's supposed deviation from its "formal policies."[11]  *Lewis II*, 934 F.3d at 1186.

Regarding Perdomo's fourth point that she changed her email signature to reflect a title of "National Project Manager – Max" without objection from her supervisors (Doc. 31-2 at 72:19-73:21), Perdomo does not explain how she was authorized unilaterally to change her title or position, let alone in this manner. Irrespective of this infirmity, I note that in an analogous context of assessing a valid comparator under the *McDonnell Douglas* framework, the fact that Perdomo may have held a title similar to Gibson's is not enough to show she is similarly situated to him.

---

[11] Perdomo also cites testimony from the HR employee, Davis, that "any increase in job responsibilities would warrant a salary increase." (Doc. 39 at 14).  Davis represented in this regard that an enlargement in an employee's duties "would generally trigger" a recommendation to enhance the employee's compensation, but that such recommendations would be based on specific situations. (Doc. 46-1 at 80–81).  Even construing this evidence in the light most favorable to Perdomo, she does not show that Davis's testimony establishes the type of "formal policy" contemplated in *Lewis II*.  934 F.3d at 1186.

*Lewis I*, 918 F.3d at 1228 ("[A] valid comparison will turn not on formal labels, but rather on substantive likeness.").

As for Perdomo's fifth point concerning the circumstances surrounding Perdomo's creation of a job description, she does not articulate in any meaningful way that TKE insisted she do so for some illicit purpose or cite any supporting evidence. Perdomo's theories and suppositions do not create a genuine issue of material fact, let alone reveal discriminatory intent. *S.E.C. v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014) ("Speculation or conjecture cannot create a genuine issue of material fact[.]").

With respect to Perdomo's sixth point that TKE exaggerates Gibson's status within the company at her expense, Perdomo seems to be taking issue with how TKE characterizes her and Gibson in its summary judgment motion, not the actions TKE undertook relative to Perdomo while she was employed there. As such, it cannot be considered by the Court here.

Regarding Perdomo's own assessment of her job performance and her annual pay increases, neither is persuasive. The fact that Perdomo subjectively believes she was an outstanding employee is not relevant. *Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir. 2000) (observing that a plaintiff's "own opinion that [her] performance is excellent does not raise a fact question as to how [her] performance compares to others") (citation omitted). As for the annual increases, Perdomo does not explain how this evidence demonstrates discriminatory intent by TKE in establishing her pay. *Menefee v. Sanders Lead Co., Inc.*, 786 F. App'x 963, 966 (11th Cir. 2019) (per curiam)

(noting that "while [the plaintiff] perceives himself to be a good worker because he received a raise and promotion in the year before his termination, his perception of himself is not relevant").

In sum, considering all of the foregoing evidence in the light most favorable to Perdomo, she does not marshal sufficient "bits and pieces" to create a triable issue of material fact as to whether TKE's actions in setting her pay were discriminatory on the basis of her sex. *Lewis II*, 934 F.3d at 1185; *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 1 F. Supp. 3d 1363, 1381 (N.D. Ga. 2014) (finding the plaintiff failed to meet his burden on summary judgment where "most of the evidentiary tiles he proffer[ed] were discarded as insufficient or irrelevant . . . [and could not] now be reassembled to create a convincing mosaic of discriminatory intent"), *aff'd*, 803 F.3d 1327 (11th Cir. 2015). Accordingly, TKE is entitled to summary judgment on Perdomo's Title VII pay discrimination claim.

### B.   *Count III: Title VII Retaliation Claim*

In Count III, Perdomo avers that TKE violated Title VII by retaliating against her, including by firing her, because of her discrimination complaints. (Doc. 15).  Title VII prohibits an employer from discriminating against an employee because she has opposed any employment practice made unlawful by that statute.  42 U.S.C. § 2000e-3(a).

The oft-employed *McDonnell Douglas* framework provides a helpful context for Perdomo's retaliation claim even though she has elected not to invoke it.  Under that framework, "a plaintiff must first establish a *prima facie* case by showing that (1) [s]he

37

engaged in an activity protected under Title VII, (2) [s]he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action." *Calvert v. Doe*, 648 F. App'x 925, 928–929 (11th Cir. 2016) (per curiam) (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010)). If a plaintiff establishes a *prima faci*e case of retaliation, "the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Calvert*, 648 F. App'x at 929 (citing *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). "If the defendant carries this burden, the plaintiff must demonstrate that the proffered reason was merely a pretext to mask retaliatory actions." *Id*. "Significantly, when it comes to retaliation claims, a plaintiff must demonstrate that [her] participation in protected activity was the 'but-for' cause of the adverse employment action." *Bailey*, 992 F.3d at 1273 n.1 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

As explained previously, Perdomo has eschewed the *McDonnell Douglas* standard in favor of the circumstantial mosaic approach. The Eleventh Circuit has found—albeit in unpublished decisions—that a plaintiff can rely on the circumstantial mosaic theory to defeat a summary judgment motion. *See, e.g., Calvert*, 648 F. App'x at 929–930; *see also Bailey*, 992 F.3d at 1273 n.1 ("We do not appear to have considered in a precedential opinion whether a plaintiff can sustain her burden to establish a circumstantial case of retaliation by relying on the 'convincing mosaic' theory, though in unpublished opinions, we have assumed that she can."); *James v. City of Montgomery*,

38

823 F. App'x 728, 735 (11th Cir. 2020) (per curiam) ("Assuming, *arguendo*, but not deciding, that retaliation claims can survive summary judgment under a convincing-mosaic theory, [the plaintiff's] declaration—the only evidence on which she relied—did not create a convincing mosaic of circumstantial evidence that created a triable issue about the [defendant's] retaliatory intent.").

In her response, Perdomo argues that she "undertook protected conduct when she made complaints to the TKE Brain Trust regarding being paid less than her male predecessor" (i.e., Gibson) and subsequently "suffered [the following] adverse employment actions" as a result: "(1) wrongful termination[ ]; (2) [Losey's August 2018] write-up in the form of a Performance Improvement Plan; and (3) ostracization at the workplace." (Doc. 39 at 18). Perdomo adds that, "[a]long with a retaliatory write-up, TKE's stated reason of job elimination [was] pretextual and proffered to disguise retaliatory animus." *Id.*

Perdomo does not delineate in the section of her response dedicated to her Title VII retaliation claim the actual particulars of the "protected conduct" in which she purportedly engaged. Instead, all she avers is that she "repeatedly complained about [Gibson] being paid more to the TKE Brain Trust comprising of Human Resources department and [her] department" and later generally refers to having made "complaints for gender-based pay discrimination." *Id.* The threshold problem posed by these vague assertions is that Perdomo does not adequately identify record evidence describing her protestations to the "TKE Brain Trust" which underlie her retaliation claim.

39

Putting aside this deficiency for the moment, I will assume for purposes of my analysis that Perdomo seeks to rely on the part of her declaration relating to her alleged gender-based inquiry to Losey—as she does for her EPA retaliation claim—to buttress her assertion about protected activity.  That portion of the declaration, to reiterate, states as follows:

> Losey, Bottom and HR decided to pay me less because I am a female. My pay never matched my male boss' salary.  I asked Gary Losey for my pay to match my job duties as Project Manager around August/September of 2017, then two more times after that between October 2017 and August 2018.  His response was "HR is working on it."
>
> * * *
>
> Once they changed my title they didn't make any comments about the pay, once I received my check reflecting the changes I noticed no change to pay and asked Gary Losey "why my pay was not reflecting my job title" *and if "I am being paid less because I am a female"* and his was response was "HR is working on that, it's a long process."

(Doc. 39 at 21) (citing Doc. 39-3 at ¶¶ 2, 12) (emphasis added).

Again drawing from her EPA retaliation claim, it seems Perdomo would also point to the following portion of her deposition:

> Q.    Can you tell me every time you complained about something to TKE that you think contributed to your termination?

> A.     Well, the two or three times I talked to Wendy Prell, the time that
> I talked to Amanda Davis, and the three times that I spoke with Gary
> Losey about my pay.

(Doc. 39 at 21) (citing Doc. 31-2 at 143:15-22).

Assuming Perdomo wishes to rely on these attestations to bolster her Title VII retaliation claim, they are unavailing.  To engage in protected activity, an employee must, "'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred.'"  *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (per curiam) (quoting *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998)); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) (holding that to qualify as protected activity for purposes of a retaliation claim under the FLSA,[12] an employee's "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and call for their protection").

Here, Perdomo's allegation that she complained to the two TKE HR representatives, Prell and Davis, is devoid of any specifics as to the nature of those conversations and does not reference any record evidence from which that information can be gleaned.  All that can be discerned from her declaration is that her exchanges with Prell and Davis related to a "complain[t] about something [which Perdomo] think[s] contributed to [her] termination."  (Doc. 39 at 18).  As such a grievance would

---

[12] The EPA, 29 U.S.C § 206(d), is part of the FLSA as amended, see 29 U.S.C. § 200, et seq.

not have alerted TKE that discrimination had taken place, I find that Perdomo has not shown that her communications with Prell and Davis amounted to protected activity.

I reach the same conclusion relative to Perdomo's deposition testimony and the statements in her declaration pertaining to her more general complaints to Losey about her pay not matching that of Gibson. *Smitherman v. Decatur Plastics Prods., Inc.*, 2017 WL 3668176, at *10 (N.D. Ala. Aug. 24, 2017) (explaining that the fact the plaintiff complained about more favorable treatment to another employee who the decisionmaker knew to be of a different race was insufficient to put the employer on notice that the plaintiff's complaints "were intended as opposition to discrimination [under Title VII] because of race") (collecting cases), *aff'd* 735 F. App'x 692 (11th Cir. 2018) (per curiam); *Garcia v. ALS Educ., Inc.*, 2016 WL 10951265, at *4 (S.D. Fla. Dec. 30, 2016) ("[C]ourts have held that '[d]emands for more compensation are not protected activity" under the FLSA) (collecting cases).  This is because those complaints were predicated on Perdomo's assertion she was being paid less than Gibson for purportedly performing the same responsibilities or having the same title as Gibson, not because she was a female.  Thus, even viewed in the light most favorable to Perdomo, her attestations that she sought the same compensation as

Gibson for these reasons does not create an inference she believed TKE was discriminating against her.[13]

The only conduct by Perdomo that could arguably constitute protected activity is her alleged questioning of Losey about whether she was being paid less as a woman. Assuming *arguendo* that this questioning survives the sham affidavit rule, I turn to Perdomo's argument that TKE subjected her to one or more adverse employment actions in retaliation.  (Doc. 39 at 18).  In order for such actions to be cognizable for purposes of a Title VII retaliation claim, Perdomo must show that "a reasonable employee would have found [those] actions[s] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (internal quotation marks and citation omitted).  That is because Title VII was not intended to serve as a "general civility code for the American workplace."  *Id.* at 68 (internal quotation marks and citation omitted).

Here, Perdomo identifies three allegedly adverse employment actions: her termination in January 2019; the August 2018 write-up by Losey; ostracization in the

---

[13] At oral argument, Perdomo highlighted three exhibits related to her retaliation claim: a September 2017 email from Perdomo to Losey and another individual which included her job description (Doc. 39-32); a document apparently prepared by Perdomo, in which she challenged the reasons for the August 2018 write-up and complained that she was unable to work overtime before she became a salaried employee (Doc. 39-33); and an August 2018 email from Perdomo to Prell which contained similar information disputing one of the bases for the August 2018 write-up (Doc. 39-37).  Even construed in the light most favorable to her, these items likewise do not raise any inference that Perdomo was raising a complaint about discrimination.

43

workplace; and the December 2018 management conference in Atlanta.  (Doc. 39 at 18).  I will address each in turn.

1.   <u>Wrongful Termination</u>

In her response, Perdomo does not explicitly address the wrongful termination component of her retaliation claim.  (Doc. 39 at 18).  Instead, as explained previously, she simply asks the Court to "consider [the] factual and legal arguments presented in support of [her] Title VII claim for gender-based pay discrimination where her *termination was pretext*."  *Id.* at 18 n.7.  Perdomo's attempt to defend the termination aspect of her retaliation cause of action in such a disjointed and abbreviated manner devoid of any legal analysis is not appropriate and arguably constitutes grounds for a waiver of that part of her claim.  *Hamilton*, 680 F.3d at 1319; *U.S. Steel Corp.*, 495 F.3d at 1287 n.13.

Even if Perdomo is not subject to such a waiver, she does not show that TKE's reasons for her discharge were pretextual, let alone that TKE acted with retaliatory intent. *James*, 823 F. App'x at 735.  I begin my analysis by first reviewing TKE's proffered justifications for firing Perdomo, *Lewis II*, 934 F.3d at 1186, and then—per Perdomo's footnote (Doc. 39 at 18 n.7)—I address the so-called "pretext arguments" she sets forth in the separate part of her response devoted to her disparate pay claim *Id.* at 15–17.

In its motion, TKE tenders evidence that it reduced its staff across the country as part of its "closing the gap" initiative and accompanying budgetary cuts.  (Doc. 31 at 19–21).  As described earlier, TKE announced its plans to decrease its work force

and attendant expenses in November and December 2018 and thereafter terminated roughly fifty employees as a result.  (Doc. 31-4).  TKE supports this decision in its motion with contemporaneous e-mails and summaries pertaining to, *inter alia*, the status of the MAX Project.  *Id.*

As also described above, TKE discharged Perdomo in connection with this reduction-in-force because of its diminishing need for a project manager on the MAX program and Perdomo's "lackluster" performance.  (Docs. 31 at 19–21; 31-4 at ¶ 9). As Story elaborated in his declaration with respect to the former rationale:

> With the installation phase of the project beginning to winddown, it was appropriate for TKE to focus on the next phase of the project, which would allow it to use the data it was receiving from the MAX devices to troubleshoot elevator problems.  [Perdomo] was not involved in this more technical aspect of the MAX Project and, thus, her services were no longer required for the MAX Project.

(Doc. 31-4 at ¶ 8).  As for the latter rationale relating to Perdomo's effectiveness on the job, TKE submitted evidence of Losey's August 2018 "write-up," in which he characterized her work as "substandard."  (Doc. 31-7).  These types of "[f]inancial considerations, along with a restructuring to accomplish cost savings, can be a legitimate[, non-discriminatory] reason for discharging an employee."  *Sordo v. Trail Auto Tag Agency, Inc.,* 2016 WL 1599525, at *4 (S.D. Fla. Apr. 21, 2016).  Thus, Perdomo must show not only that these reasons were false, but that discrimination based on her gender was the real basis for her termination.  *Lewis II*, 934 F.3d at 1186.

In an effort to meet this burden, it appears Perdomo would point to: (1) evidence that she was awarded a bonus in the fall 2018 without any mention of any impending

layoffs; (2) a November 2018 email "amongst" the "TKE Brain Trust" addressing a hiring freeze for new employees but not a staff reduction; (3) the absence of any documented correspondence during this period regarding the conclusion of the MAX Project; and (4) email correspondence involving members of the "Brain Trust" where they refer to the termination of underperforming and nonperforming employees at the company.  (Doc. 39 at 15–16).

With respect to Perdomo's last point regarding the firing of lesser performing employees, Perdomo does not explain the relevance of this evidence to her contention she was targeted for retaliation based upon her protected activity.  Stated differently, she does not address "head on" TKE's primary reason for terminating her—namely, that she was discharged as part of the "closing the gap" initiative since she was not involved in the more technical aspects of the MAX Project to come.  *Crawford*, 482 F.3d at 1308 (explaining that a plaintiff must rebut each nondiscriminatory reason to show pretext).   And, to the extent Perdomo argues that she was not an underperforming employee, squabbling with TKE on that point is insufficient, especially given that she received a less than favorable write-up in the months leading up to her termination.  An employee cannot merely "show that [her] performance was satisfactory" but "must demonstrate that the employer did not believe that [her] performance was lacking, and merely used that claim as a cover for discriminating against him."  *Menefee*, 786 F. App'x at 966 (per curiam); *see also Jurrians v. Ala. Cooperative Extension Sys.*, 806 F. App'x 753, 756 (11th Cir. 2020) (per curiam) (finding that the plaintiff did not create a genuine issue of material fact as to pretext for purposes

46

of an age discrimination claim by arguing "she and others say she performed her job well" since that did "not matter").  As such, even construed in the light most favorable to her, the fact that there were discussions within the "Brain Trust" about underperforming and nonperforming workers does not show retaliatory animus with respect to her later termination.

I am also unpersuaded by Perdomo's suggestion by way of her first two points that TKE was not actually trimming its staff as it claimed.  TKE provided evidence that it announced its "closing the gap" initiative and would be making budget reductions across the country in late 2018.  (Doc. 31-4).  Perdomo does not submit any contradictory proof indicating that this contraction in the work force did not actually occur, and her unsupported theory that the initiative was used as a mechanism to lay her off in retaliation for her protected conduct is inadequate.  *Monterosso*, 756 F.3d at 1333.

Perdomo's contention in her remaining point that there was no documented "discussion regarding the conclusion of the MAX project" likewise lacks merit.  (Doc. 39 at 15).  TKE did not rely on the "conclusion" of the MAX Project in its *entirety* to justify its discharge of Perdomo, but rather stated that its continuing need for Perdomo's specific role on the project was diminished.  (Doc. 31 at 20).  This is supported by a contemporaneous email in which Story advised that TKE was "eliminating [Perdomo's] position, because we are no longer needing to 'Project Manage' our MAX installations."  (Doc. 31-4 at 19).  Perdomo does not rebut this evidence.

In a further attempt to show that TKE's reduction-in-force was a pretext for her purportedly retaliatory firing, it seems Perdomo would relatedly argue that the installation phase of the MAX project was not nearing completion in January 2019, as TKE maintains.  (Doc. 39 at 16).  To support this contention, Perdomo cites to (1) a July 26, 2018, letter informing her that "[c]urrently your position is scheduled to relocate [to a new headquarters in] Atlanta in 2022" (Doc. 39-31); (2) the alleged existence of "open and budgeted positions" within the department responsible for the MAX Project (Doc. 39-21 at 4); (3) the fact that upon Perdomo's discharge, her duties were transferred to Brown, who allegedly reported to the ITS division but whose salary was charged to the MAX Project division (Doc. 39 at 17) (citing Doc. 39-21); and (4) the fact that Brown was retained even though she was a higher-paid employee (Doc. 39 at 17).

The overarching problem with this line of argument is that TKE again does not claim it let Perdomo go because the MAX program was ending altogether.  It instead maintains that it included Perdomo in the "closing the gap" initiative because "her services were no longer required for the MAX Project" moving forward, as she was not involved in the more technical aspects of the program that were forthcoming at that point.  (Doc. 31-4 at ¶ 8).  Perdomo fails to demonstrate that this reason for her discharge is false.

An examination of the particular portions of the record to which Perdomo cites does not cure this problem.  By way of example, the July 26, 2018, letter shows, at most, only that during this time frame (i.e., several months before TKE's CEO,

Murmane, announced TKE's reduction-in-force plans), the company contemplated moving Perdomo's position to Atlanta.  (Doc. 39-31).  This fact, however, does not "cast sufficient doubt" on TKE's proffered nondiscriminatory justification for terminating Perdomo, such that a reasonable fact finder could conclude that this reason was not what actually motivated TKE's conduct.  *Lewis II*, 934 F.3d at 1186.

As for Perdomo's observation that unfilled positions on the MAX Project remained after her discharge, or her suggestion that TKE's decision to fire her instead of Brown is suspicious (Doc. 39 at 17), these claims essentially amount to speculative challenges to TKE's business decisions about which personnel to retain and what positions to keep open.  The Eleventh Circuit has cautioned that a plaintiff may not establish that an employer's proffered reason is pretextual "by simply quarreling with the wisdom of that reason" provided the reason is "one that might motivate a reasonable employer."  *Chapman*, 229 F.3d at 1030.

Perdomo's focus on TKE's retention of Brown is particularly lacking.  Although it is true that Brown was paid a higher salary than Perdomo, TKE's termination of Perdomo while keeping Brown is consistent with TKE's desire to limit its outlays because it meant it no longer had to pay Perdomo.  Furthermore, Perdomo herself argues that Brown had a "longstanding working relationship" with Story, which—as TKE notes—is a sufficient nondiscriminatory reason by itself to support its discharge of Perdomo and its continued employment of Brown.  (Doc. 39 at 17); *see also Devito*, 2021 WL 5826120, at *12 n.10 ("Favoritism towards friends does not violate Title VII. . . .").

49

In sum, Perdomo fails to create a factual issue as to whether TKE's reasons for her termination were pretextual, *Lewis II*, 934 F.3d at 1185–86, or to otherwise show retaliatory intent, *James*, 823 F. App'x at 735.

2.   Losey's August 2018 Write-up

As noted above, Perdomo identifies Losey's 2018 write-up in her response as another adverse employment actions she suffered.  (Doc. 39 at 18).  She describes the merits of the write-up as "suspect," pointing to (1) an email she sent to an HR employee, Sandee Crossley, which included her "job description" (Doc. 39-32); (2) a document that appears to be Perdomo's rebuttal to allegations that her work contained inaccuracies (Doc. 39-3); (3) a July 2018 email Perdomo sent to another HR employee, Davis, in which she states that Story "is always attacking [her] without knowing or researching the facts" and that she is uncomfortable with him becoming her "boss" (Doc. 39-34); and (4) an August 2018 email Perdomo sent to yet another HR employee, Prell, in which she describes the write-up as "bizarre" (Doc. 39-37).  (Doc. 39 at 18–19).  Perdomo then states in conclusory fashion that "[i]n retaliation for her pay complaints, [t]he TKE Brain Trust actors, Losey[,] Prell, and Antonneau . . . collaborate[d] extensively to place [her] on the [performance improvement plan]." (Doc. 39 at 18–19).  These points are unavailing.

Perdomo does not show that the August 2018 write-up "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 67–68 (internal quotations omitted).  For one, Perdomo herself was hardly inhibited from expressing her displeasure with this

unfavorable review, acknowledging that she complained to Prell about it the same month she received it.  (Doc. 39 at 18–19).

Further, Perdomo admitted she received a pay raise after she was given the write-up, followed by a bonus.  (Docs. 31-2 at 98:19-99:10; 39-29).  In fact, Perdomo even testified that Losey was "not successful" in authoring a negative evaluation of her performance because she still received a pay increase.  (Doc. 31-2 at 98:19-99:10). These facts also show that the write-up was not materially adverse to Perdomo, and Perdomo does not meaningfully argue otherwise.   *Debe v. State Farm Mut. Auto. Ins. Co.*, 860 F. App'x 637, 640 (11th Cir. 2021) (per curiam) (holding that "alleged negative feedback [and] placement on performance management . . . did not constitute materially adverse actions [for purposes of a Title VII retaliation claim], since [the plaintiff] offered nothing to suggest that they caused him an objective injury or harm, like a reduction in pay, benefits, or responsibilities").

### 3.   Ostracization in the Workplace

Perdomo's complaint about ostracization at TKE stems from the change in her workstation at the end of 2017, when—according to her testimony—Bottom gave her enclosed office to a new male employee who was not a "project manager" and moved Perdomo to a cubicle.  (Docs. 31-2 at 227:13–18; 228:1–2; 39-3 at ¶ 3).  The problem with this allegation is that, like the write-up, it too does not appear to amount to a materially adverse action.  *See Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 968 (11th Cir. 2017) (per curiam) (citing *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 831 (8th Cir. 2002) for the proposition that "in employer retaliation cases, ostracism

51

and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action"); *Barnwell v. Shulkin*, 2017 WL 4810598, at *4 (S.D. Fla. Oct. 25, 2017) (finding for purposes of a Title VII retaliation claim that "[m]oving from an office to a cubicle is clearly the type of petty slight or minor annoyance that all employees experience").

In addition to this problem, the record evidence surrounding this event—such as the actual role of the male employee—is lacking. And measured against this dearth of proof is the testimony from another TKE employee, who explained that the office move was the result of a "restructure of some kind," which involved the relocation of other employees' desks as well. (Doc. 46-1 at 71:4-22).

In sum, Perdomo does not identify adequate evidence to show that the change in her workplace is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington Northern*, 548 U.S. at 67–68, or bears any connection to her purported complaints about her pay, particularly where some of those complaints occurred after the office move.

### 4. December 2018 Management Conference

The circumstances surrounding the December 2018 management conference in Atlanta do not amount to an adverse employment action or demonstrate retaliatory intent either. The uncontested facts reveal that although Perdomo did not know it at the time, TKE was aiming to part ways with her when the issue of her attendance at the conference first arose. (Doc. 31-4). Thus, it made sense that TKE did not initially offer her an opportunity to go to the conference. In addition, Perdomo acknowledges

that Losey—to whom she allegedly complained about her pay—allowed her to attend the business meeting in the end anyway.  (Doc. 31-2 at 137:8-23).[14]  And again, Perdomo does not point the Court to evidence connecting this situation to any protected activity and does not argue or cite any legal authority demonstrating that this entire episode constituted an "adverse employment action" sufficient to support a retaliation claim. *Burlington Northern*, 548 U.S. at 67–68.

In light of all of the above, TKE is entitled to summary judgment on Perdomo's Title VII retaliation claim.

### C.   *Count IV: Title VII Wrongful Termination Claim*

In Count IV, Perdomo avers that TKE wrongfully terminated her "because of her gender and in retaliation for her discriminatory complaints." (Doc. 15).  As I have already addressed Perdomo's claim of retaliation based on her complaints in Section IV.B, I will confine my analysis here to the gender-based component of her wrongful termination cause of action.

Title VII makes it unlawful "for an employer . . . to discharge any individual" as a result of her sex.  42 U.S.C. § 2000e-2(a)(1).  As with her other Title VII claims, Perdomo seeks to proceed on this claim solely under the convincing mosaic standard. The Eleventh Circuit has applied that standard in a discriminatory discharge case under Title VII.  *Smith*, 644 F.3d at 1328.

---

[14] Perdomo's attestation in connection with her response that she "had to go around Greg Bottom and Terry Story and [had to] ask[ ] the conference organizer to let [her] go to the conference" (Doc. 39-3 at ¶ 4) does not contradict her deposition testimony that Losey ultimately approved her attendance.

To prevail on her wrongful termination claim, Perdomo must provide a convincing mosaic of circumstantial evidence that would allow a jury to infer that her termination from TKE was predicated on discriminatory intent. *Id.* Perdomo fails to do so.

As an initial matter and as discussed at the outset, Perdomo does not separately address her wrongful termination cause of action in her response and instead appends a footnote to the phrase "wrongful termination" in her Title VII retaliation claim, in which she requests the Court to "consider [the] factual and legal arguments presented in support of [her] Title VII claim for gender-based pay discrimination where her *termination was pretext*." (Doc. 39 at 18 n.7) (emphasis in original). As also explained previously, neither the footnote nor the portion of the response to which the footnote refers contains any meaningful legal analysis regarding the contours of Perdomo's wrongful termination cause of action. As such, Perdomo has waived her defense of that claim. *Hamilton*, 680 F.3d at 1319; *U.S. Steel Corp.*, 495 F.3d at 1287 n.13.

Even were the Court not to find such a waiver, Perdomo would still not survive TKE's summary judgment motion on this count because she does not demonstrate that her discharge was pretextual for the reasons set forth above. And, Perdomo otherwise fails to marshal a convincing mosaic of circumstantial evidence showing discriminatory intent. *Smith*, 644 F.3d at 1328.

## V.

I turn now to Perdomo's two EPA claims contained in Counts V and VI. TKE is entitled to summary judgment on both.

54

### A.   Count V: EPA Retaliation Claim

Perdomo avers in Count V that TKE violated the EPA by taking discriminatory actions against her, including by firing her, because she complained to TKE about "gender discrimination in compensation" and about "rectify[ing] the pay disparity between her and [Gibson]." (Doc. 15).  The anti-retaliation provision in the EPA renders it unlawful for an employer to "'discriminate against any employee because [the] employee has filed any complaint'" relating to the EPA.  *Smith v. Florida A&M Univ. Bd. of Trustees*, 831 F. App'x 434, 441 (11th Cir. 2020) (quoting 29 U.S.C. § 215(a)(3)); *see also Hornsby-Culpepper,* 906 F.3d at 1314 (same).  As Perdomo acknowledges, retaliation claims under the EPA are analyzed using the *McDonnell Douglas* burden-shifting framework.  *Storves v. Island Water Assoc., Inc.*, 2010 WL 11622686, at *3 n.4 (M.D. Fla. Nov. 3, 2010).

 As with Title VII, to establish a *prima facie* case for an EPA retaliation claim, a plaintiff must show that "(1) she engaged in activity protected under the act; (2) she subsequently suffered a materially adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Hornsby-Culpepper*, 906 F.3d at 1314, n.9 (citing *Wolf*, 200 F.3d at 1342–43).

If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to proffer a legitimate reason for the adverse action.  *Wolf*, 200 F.3d at 1342–43.  If the employer does so, the plaintiff must then establish that the proffered reason was pretextual.  *Id.* at 1343.  To establish the necessary causation at this stage, a

plaintiff must demonstrate that "the adverse action would not have been taken 'but for' the assertion of [her] FLSA rights." *Wolf*, 200 F.3d at 1343; *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 n.13 (11th Cir. 2020) ("[W]e will assume here that the but-for test is to be applied at the pretext stage of the summary judgment examination. . . .").

Perdomo's EPA retaliation claim fails on a number of levels.  As a threshold matter, Perdomo does not reference the above elements or the *McDonnell Douglas* framework in her response, much less apply them to the particular facts of her case. Instead, as noted earlier, she again simply asks the Court to apply her "factual and legal arguments presented in support of [her] Title VII claims [to] her [EPA] claims." (Doc. 39 at 20 n.8).  For the reasons stated above, Perdomo's cursory treatment of this claim constitutes a waiver.  *Hamilton*, 680 F.3d at 1319; *U.S. Steel Corp.*, 495 F.3d at 1287 n.13.

Even were the Court not to find a waiver, Perdomo's EPA retaliation claim still does not survive TKE's summary judgment motion based on the uncontested facts before the Court.  Extrapolating from the arguments Perdomo makes in support of her Title VII claims, she would presumably argue that she engaged in protected activity because she "complained about her gender-based pay discrimination on numerous occasions to her superiors and HR officials" (Doc. 39 at 21); that she suffered materially adverse actions by TKE in the form of her termination, the August 2018 write-up by Losey, and the "ostracization in the workplace" (Doc. 39 at 18); and that there was a causal connection between these actions and her protected activity.  As I

56

have already addressed the deficiencies with Perdomo's protected activity and adverse employment arguments, I will focus here on whether she can establish a causal connection as part of her *prima facie* case.

To meet the causal connection requirement, a plaintiff must establish "that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)). A plaintiff can demonstrate the latter by showing a close temporal proximity between the statutorily protected activity and the adverse employment action. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

Perdomo does not satisfy the causal connection requirement here. I start with the matter of her termination, which she lays at the feet of the "TKE Brain Trust," who—she asserts—finalized her separation from TKE. (Doc. 39 at 16). There are two problems with this contention in the context of Perdomo's EPA retaliation claim. First, she does not point to any evidence demonstrating that the "TKE Brain Trust" knew about any of her alleged complaints to Losey. *Shannon*, 292 F.3d at 716 (requiring the decision-makers to be aware of protected conduct).

Second, there was an extended delay between the time Perdomo made her allegedly gender-specific inquiry to Losey and TKE's decision to fire her. I note in this regard that, although Perdomo does not clearly identify when she asked Losey if she was being paid less because she was a female, it appears from her declaration that she

57

did so after her title was formally changed in April 2018.  (Doc. 39-3 at ¶ 12) ("[O]nce I received my check reflecting the change [to my title,] I noticed no change to pay and asked Gary Losey 'why my pay was not reflecting my job title' and if 'I am being paid less because I am a female' and his response was 'HR is working on that, it's a long process.'").  As for the timing of TKE's decision on Perdomo's termination, the uncontested facts indicate that Story and Bottom made that determination roughly seven months later, in November 2018.  (Doc. 31-4 at ¶ 9)  Given the lengthy passage of time, Perdomo is not entitled to an inference of a causal connection between her supposedly protected activity and her discharge.  *Debe*, 860 F. App'x at 639–40 (explaining that "temporal proximity must be 'very close' [such that a] three-to-four-month delay is too long[, while] a one-month gap may satisfy the test"); *Gilliam v. U.S. Dep't of Veterans Affairs*, 822 F. App'x 985, 990 (11th Cir. 2020) (per curiam) ("[T]he lapse of three months between [the employer's] alleged discovery of [the plaintiff's] statutorily protected expression and the adverse employment action is too long to permit an inference of causation based on temporal proximity alone.").

Perdomo's other non-gender specific complaints to Losey appear to have occurred, at the latest, in August 2018.  (Doc. 39-3 at ¶ 2)  This three-month delay presents too long of a gap as well.  *Gilliam*, 822 F. App'x at 990; *Debe*, 860 F. App'x at 639–40.  As for the unspecified complaints to HR, Perdomo does not identify when those occurred.

Lastly, even assuming Perdomo could establish a *prima facie* case of retaliation, she ultimately fails to show that the reasons for her termination were pretextual, as

explained above, or that her gender complaints were ultimately the "but for" cause of her termination.

### B.   Count VI: EPA Disparate Pay Claim

Perdomo asserts in Count VI that TKE violated the EPA by paying her less than Gibson and other similarly situated male colleagues.  (Doc. 15).  The EPA makes it unlawful to discriminate "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex" for equal work.  29 U.S.C. § 206(d)(1).

A plaintiff establishes a *prima facie* case for an EPA disparate pay claim by showing that her employer paid differing wages to employees of opposite sexes for "equal work on jobs the performance of which require[ ] equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  In assessing the similarity of work, a court must "compare the jobs, not the individual employees holding those jobs."  *Mulhall*, 19 F.3d at 592.  While a plaintiff is not required to prove that her position was identical to that of her comparator, "the standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high."  *Id.* (quoting *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1999)); *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, 2021 WL 3123767, at *6 (S.D. Fla. July 22, 2021) ("A plaintiff . . . fails to make a *prima facie* case of unequal pay if the job responsibilities of her alleged comparator were greater than her own."), *aff'd* Case No. 21-12854 (11th Cir. July 15,

2022).   In conducting this analysis, a job title is considered to be relevant but not dispositive.  *Mulhall*, 19 F.3d at 592.

If a plaintiff makes out a *prima facie* case, the employer may avoid liability by proving by a preponderance of evidence that the discrepancy in pay was due to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).  Of relevance here, the last affirmative defense applies when the challenged pay disparity "results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business."  *Mulhall*, 19 F.3d at 596.  The employer bears a "heavy" burden to establish one of these affirmative defenses and "must demonstrate that 'the factor of sex provided *no basis* for the wage differential.'"  *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003) (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)).   A plaintiff "must rebut the [employer's] explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential."  *Steger*, 318 F.3d at 1078 (quoting *Irby*, 44 F.3d at 954).

In her response, Perdomo does not make out a *prima facie* case by showing that she and Gibson performed equal work.  (Doc. 39 at 20–22).  In fact, she fails to address the matter, other than to ask again that the Court consider the "factual and legal arguments presented in support of [her] Title VII claims for her [EPA] claims."  (Doc.

60

39 at 20 n.8).[15]  Because Perdomo does not satisfactorily explain how her work was equivalent to Gibson's in terms of skill, effort, and responsibility, she has arguably waived any such argument for the reasons discussed previously.  *Hamilton*, 680 F.3d at 1319; *U.S. Steel Corp.*, 495 F.3d at 1287 n.13.

Even were the Court not to find such a waiver here, TKE is still entitled to summary judgment on Perdomo's EPA disparate pay claim because Perdomo has not met the "high standard" required to demonstrate that her and Gibson's responsibilities were equal.  I note as an initial matter that, unlike Perdomo, Gibson helped start the MAX Project and was instrumental in moving it from the installation phase to the activation phase.  (Docs. 31-2 at 45:3-14, 55:14-16; 31-3 at ¶ 4).  Furthermore, certain of Gibson's responsibilities appear to have exceeded Perdomo's to the extent that he worked with the overseas production company to place orders; communicated with and tracked shipments from an overseas supplier; and managed the MAX mailing project.  (Docs. 31-3 at ¶ 4; 39-3 at ¶ 5); *see Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 787 (11th Cir. 2015) (per curiam) (holding that the plaintiff failed to establish a *prima facie* case of gender discrimination under the EPA where the record reflected that her comparator who performed the job at a different time was charged with job responsibilities during his tenure that the plaintiff did not perform).  Although

---

[15] Perdomo predicates this request on her claim that "there is considerable overlap between the two statutory schemes" found in Title VII and the EPA.  (Doc. 39 at 20 n.8).  This assertion is unfounded. *See Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (observing that, in pay disparity claims, Title VII and the EPA diverge "as to both elements and burdens of proof").

Perdomo contends in a perfunctory manner that some of these distinctions are immaterial, she does not support that argument in her response with sufficient evidence and argument. *See, e.g.,* (Doc. 39 at 6) (admitting that Perdomo placed orders internally, as opposed to externally, but stating generally that this distinction was immaterial).

Even assuming Gibson and Perdomo's responsibilities were equal once Perdomo allegedly took over Gibson's role, TKE has shown by preponderance of the evidence that the pay difference between Perdomo and Gibson was due to "factors other than sex." 29 U.S.C. § 206(d)(1). These factors include TKE's classifications of Perdomo and Gibson as Project Manager Level 1 and Project Manager Level 4, respectively; Gibson's greater education and experience; and TKE's limitations on promotional based pay increases. (Doc. 31 at 23–24); *see also* 29 U.S.C. § 206(d)(1). Such evidence is adequate to establish a gender-neutral reason for the differential in Perdomo and Gibson's salaries. *See, e.g., Blackman*, 599 F. App'x at 912 (stating that "differences in experience and education" were sufficient to demonstrate that the challenged salary differential at issue in the case was based on factors other than gender); *Lawson-James v. City of Atl.*, 485 F. App'x 374, 377 (11th Cir. 2012) (per curiam) (determining that employees being compensated "at a rate commensurate with their experience, education, and knowledge" was a legitimate reason unrelated to gender to explain a pay disparity).

The only item in the record Perdomo arguably cites in an effort to rebut this proof is the testimony of one of TKE's HR representatives, Davis, that the company

did not have a "seniority system for salary recommendations." (Doc. 39 at 21) (citing 46-1 at 91:2-4). Perdomo, however, does not provide any additional argument or evidence to explain what this means or how it creates a disputed issue of material fact relative to her EPA disparate pay claim given the reasons tendered by TKE. *See also Calicchio*, 2021 WL 3123767, at *12 (explaining that experience can constitute a legitimate "factor other than sex" even if does not rise to the level of an established seniority system).

Regardless, Davis testified that she did not work on compensation decisions during Perdomo's tenure at TKE and was unfamiliar with compensation policies in effect around the time of Perdomo's employment. (Doc. 46-1 at 38:25-39:4, 113:4-7). As such, at least on this record, it does not appear that Davis is even qualified to opine about the salary-related matters upon which Perdomo now relies.

Furthermore, even aside this foundational issue, Davis also testified that TKE considered education, job performance, time within the role, and work experience both at the company and elsewhere when making compensation decisions. (Doc. 46-2 at 139:15-142:9). These factors identified by Davis cohere with the bases cited by TKE as to why it paid Perdomo less than Gibson.

Interspersed in Perdomo's response are two other points that could conceivably be construed as relevant to her EPA disparate pay claim. The first of these is her comment that TKE "places great emphasis on a geographical adjustment to excuse the *enormous* pay disparity between Perdomo and Gibson." (Doc. 39 at 21) (emphasis in original). Perdomo then states that a geographical/cost of living adjustment "is only

warranted at the outset of a relocation." (Doc. 39 at 21) (citing Doc. 39-14 at 8). Irrespective of the merits of this contention, Perdomo does not explicate how it detracts from the other independent criteria TKE has proffered to justify the differences in Gibson and Perdomo's levels of renumeration.

The other point is Perdomo's complaint that TKE "kept her salary at the bottom of its compensation range long after she had been promoted to National Project Manager in September 2017" and that she was paid less as an exempt employee. (Doc. 39 at 21). Perdomo again does not articulate how these facts advance her EPA disparate pay claim.

## VI.

Finally, TKE argues it is entitled to summary judgment on the issue of Perdomo's entitlement to "wage-based damages" because she did not search for other employment after her separation from TKE and also now earns more than she did when employed at the company. (Doc. 31 at 24–25).[16]  To buttress this argument, TKE cites Perdomo's deposition testimony that she started a business after she was let go from the company and that, at least of the time of her deposition, earned "way more" than she did at TKE. (Doc. 31-2 at 210:13-211:11). Perdomo counters that this is a mischaracterization of her testimony (Doc. 39 at 10) and added at oral argument

---

[16] In its reply, however, TKE argues for "dismissal" of Perdomo's "termination claims" on this basis. (Doc. 45 at 7).

that she seeks more than back pay in her operative complaint in any event (Doc. 15 at 13, 16, 17, 18, and 20).

To recover back pay under Title VII, a "plaintiff is required . . . to mitigate [her] damages by being reasonably diligent in seeking employment substantially equivalent to the position [she] lost." *Walters v. City of Atlanta,* 803 F.2d 1135, 1145 (11th Cir. 1986) (citing 42 U.S.C. § 2000e-5(g)). The employer bears the burden of showing that the plaintiff failed to mitigate damages and generally must prove that "substantially equivalent work was available and that the employee did not use reasonable diligence to obtain it." *Hudson v. Chertoff*, 473 F. Supp. 2d 1292, 1297 (S.D. Fla. 2007). Where, however, the "employer proves that the employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially comparable employment." *Hudson*, 473 F. Supp. 2d at 1297. Some courts have recognized that self-employment is a method of mitigating damages for purposes of the back-pay determination. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, (S.D. Fla. 1998).

The problem with TKE's wage-based damages argument is that it is based on a relative paucity of information in the record and does not appear to be particularly well-developed on a number of material issues, including the specifics of Perdomo's efforts to launch her new commercial venture and her subsequent income from that enterprise. While these deficiencies provide grounds for denying this aspect of TKE's summary judgment motion, *see Stabler v. Fla. Van Lines, Inc.*, 2012 WL 32660, at *7 (S.D. Ala. Jan. 6, 2012) (denying summary judgment motion because the record was

underdeveloped relative to various material items); *see also Univ. of Miami*, 2021 WL 4459684, at *16 (finding that whether a plaintiff mitigated her damages to be a fact question for the jury), the Court need not address the matter given the merits of the other arguments set forth in TKE's motion.

VII.

In light of the foregoing, I respectfully recommend that TKE's *Motion for Summary Judgment* (Doc. 31) be granted.

Respectfully submitted this 22nd day of July 2022.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable Virginia Covington, United States District Judge
Counsel of record